SECOND DIVISION
September 12, 2006

No. 1-05-0511

| | | |
|---|---|---|
| JOYCE AYALA, Individually and as Special Administrator of the Estate of Michelle Ayala, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TARIQ MURAD; TARIQ MURAD, LTD.; and BARRINGTON PATHOLOGY, LTD., | ) ) | Honorable Mary A. Mulhern, |
| | ) | Judge Presiding. |
| Defendants-Appellees. | ) | |

JUSTICE SOUTH delivered the opinion of the court:

Plaintiff, Joyce Ayala, individually, and as special administrator of the estate of her daughter, Michelle Ayala, brought this medical malpractice action seeking damages for the alleged injury and wrongful death of Michelle. Following the presentation of plaintiff's case-in-chief, the trial court granted the motions of defendants Tariq Murad, M.D., Tariq Murad, Ltd., and Barrington Pathology, Ltd., for a directed verdict on the grounds that plaintiff had failed to prove the proximate cause element of her claim.

On April 8, 1998, Michelle Ayala, who was 18 years old at the time, had a large tumor surgically removed from her abdomen by Dr. Regis Weiss at Good Shepherd Hospital in Barrington, Illinois. Tests performed at the time by Dr. Murad, a pathologist, indicated it was a noninvasive borderline ovarian tumor. Approximately 18 months later, Michelle was diagnosed as having a stage IV ovarian tumor with the cancer having spread or metastasized to her lungs and

the bone of her spine. On September 9, 2000, Michelle died of low blood pressure and other complications of metastatic ovarian cancer. Plaintiff ultimately filed a medical malpractice complaint against Dr. Murad, individually, and as an agent for Tariq Murad, Ltd., and Barrington Pathology, Ltd., under the Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 1998)) and the Survival Act (755 ILCS 5/27-6 (West 1998)).[1] Plaintiff alleged, *inter alia*, that Dr. Murad had failed to provide a proper pathological diagnosis of Michelle's tumor which led to the complications resulting in her death.

During the jury trial, Dr. Regis Weiss, a gynecologic oncologist, testified that he first examined Michelle in the spring of 1998. She had recently lost a considerable amount of weight by choice but did not lose abdominal girth. Michelle's family physician, Dr. Ferolo, referred her to Dr. Weiss after discovering a very large mass filling her abdomen, which was confirmed by a CT scan. Michelle had a very distended abdomen and, as best as Dr. Weiss could tell, it extended from her rib cage, down to her pubic bone, and out into the flanks, which constitute the sides of the abdominal wall, and filled all the available space. He thought it was probably a benign mucinous tumor due to its size and Michelle's age. Dr. Weiss testified that the larger the tumor, the less likely it is to be malignant, and that malignancies are usually more symptomatic before reaching such a large size. Dr. Weiss scheduled surgery to remove the mass and informed Michelle that he would possibly need to do a second operation if something malignant were found.

---

[1]On September 11, 2003, plaintiff voluntarily dismissed her complaint against Dr. Regis Weiss and Chicago Gynecological Oncology, S.C. On January 13, 2005, plaintiff's complaint against Advocate Heath and Hospitals Corp. was dismissed following settlement with plaintiff.

During Michelle's surgery on April 8, 1998, Dr. Weiss felt the surface of her tumor, which did not appear to be attached to the abdominal wall, intestine, or anything behind it, which meant it was more likely benign. Due to the size of the growth, which was over 60 pounds, Dr. Weiss chose to decompress it by suctioning out approximately six gallons of liquid. The remaining mass, which weighed about nine pounds, was also removed and sent along with two fluid samples to the pathologist. While awaiting the results, Dr. Weiss observed various organs and portions of the abdomen and did not feel or see any abnormalities.

The pathologist, Dr. Murad, telephoned during the surgery and said it was a mucous-type tumor, and while he saw some borderline changes in focal areas, it did not appear to have any invasion. Dr. Weiss then closed the patient and did not take any further action. If Michelle's tumor had been diagnosed as malignant, Dr. Weiss would have done washings from various areas of the abdomen, taken additional samples, removed the omentum, and done a lymph node dissection. Within several days of the surgery, Dr. Weiss received a final written report from Dr. Murad which was a product of a complete sampling of the tissue and fluid provided. Dr. Murad concluded that Michelle's growth was a mucinous ovarian tumor of low malignant potential or a borderline tumor. Dr. Weiss shared the results of the pathology report with Michelle and her mother in April 1998 and told them "that while it was not a benign tumor, a borderline tumor was not as worrisome as cancer." During the 14 months following the surgery, Dr. Weiss did four follow-up examinations and did not discover any abnormalities. In September 1999, he was told by Dr. Ferolo that Michelle was found to have a femoral or bony tumor, and when they investigated, she also had tumors in her lungs.

Dr. Murad testified he is a board-certified pathologist and he, and his partner, Dr. Raja Bahu, perform pathology services at Good Shepherd Hospital. On April 8, 1998, he inspected Michelle's tumor after it was sent to the pathology lab from the operating room. Dr. Murad found no obvious macroscopic or visual invasion. He also made four frozen section slides from the nine-pound tumor. When Dr. Murad looked at the frozen sections under a microscope, he saw only a borderline tumor. A borderline tumor of the ovary is the same as a tumor of low malignant potential. Dr. Murad contacted Dr. Weiss during the surgery and informed him that the tumor was borderline. He subsequently took several slices throughout the nine-pound tissue sample which resulted in 21 permanent section slides. On April 9, 1998, he examined each of the slides under a microscope and provided a two-page pathology report which contained the following diagnosis: "right tube and ovary, mucinous ovarian tumor of low malignant potential (borderline tumor), see microscopic description." In the microscopic description, he wrote, "no invasion is identified in any of the sections examined, and there are areas in which the lining is that of a single layer of mucinous secreting columnar type cells with basal nuclei." He wrote "absent" in the column pertaining to vascular invasion. Dr. Bahu also looked at Michelle's slides and agreed that it was a borderline tumor.

Dr. Robert Mandal testified he was Michelle's primary medical oncologist from September 1999 until her death. When Michelle became his patient, she had stage IV ovarian cancer which had already spread to the lungs and the bone of the spine. As a medical oncologist, Dr. Mandal treats cancer patients with chemotherapy and other injectable or orally administered modalities. He opined that Michelle's tumor most likely spread through the blood from her ovary. Five

different chemotherapy regimens were tried on Michelle, but none worked. Dr. Mandal testified that stage IV ovarian cancer which has metastasized to the lung and bone, according to the Federation of International Obstetricians and Gynecologists (FIGO) standards, is incurable, regardless of the chemotherapy used.

Plaintiff presented the testimony of two retained medical witnesses, Dr. William Welch and Dr. Donald Goldstein. Dr. Welch, a gynecologic pathologist at Brigham and Women's Hospital in Boston, Massachusetts, testified that he reviewed the complete set of slides prepared by Dr. Murad, including the frozen section slides. Dr. Welch testified that surgeons rely heavily on what the pathologist reports, especially as to whether the pathologist refers to something as benign or malignant. The features that are found in a tumor are also extremely important for the oncologist when making decisions as to what the next stage will be for the patient's care. He testified that a borderline mucinous tumor of the ovary generally "implies that the epithelial lining of the cysts of one of these multicystic tumors has proliferated to a degree that some of the cells are piling up on top of each other. And there may be some degree of atypicality in those cells. They don't look nice and orderly and well behaved like a benign tumor would."

Dr. Welch further testified that Michelle's tumor was "predominantly borderline," but within this borderline tumor, there was "the development of more ominous findings." The lymphovascular invasion placed portions of the tumor into a different category than borderline. Dr. Welch testified "it is not at all uncommon to have a tumor in which in one aspect you have a very benign epithelium and then you have a borderline proliferative atypical epithelium and then in another area a focus of invasion or many foci of invasion." Michelle's tumor was not just a

borderline tumor because once there was an invasion, the tumor cells were expressing an ability to invade, and that was a very important biological parameter. "If there is a malignant tumor with a lot of invasion and some other worrisome features, the patient clearly goes to chemotherapy or *** some other form of therapy to try to stop this tumor from growing and metastasizing." Dr. Welch believed Michelle's tumor had "gotten into lymphatics and *** into the blood vessel, although not everyone would agree with the interpretation that what [he] consider[ed] blood vessel invasion is truly blood vessel invasion." When a tumor is predominantly borderline, but also includes malignant features, the latter controls the treatment and final outcome. The standard of care in this case required the pathologist to make the correct diagnosis, which included mentioning the fact that there was invasion into the stroma of the tumor. Dr. Welch believed Dr. Murad deviated from the standard of care by not seeing the areas of most concern and not reporting them.

Dr. Welch provided extensive testimony as to what he observed on the various slides created by Dr. Murad and noted, in particular, that one nodule on a slide represented a major invasive component of the tumor, which went beyond what anyone might call a microinvasion. Dr. Welch reviewed Dr. Murad's final pathology report dated April 9, 1998, and concluded it deviated from the standard of care because it did not include any mention of stroma, lymphatics, or vascular invasion. Dr. Welch also believed the report deviated from the standard of care because it indicated there was no invasion found in any of the sections examined. Finally, he testified the standard of care required carcinoma, or adenocarcinoma, to appear in the final pathological diagnosis because there was clear-cut evidence of invasion. Dr. Welch would have assumed the tumor would ultimately behave as a carcinoma and not as a borderline tumor.

Prior to the testimony of Dr. Goldstein, defendants filed a motion *in limine* seeking to bar him from testifying as to the management, treatment and/or effectiveness of chemotherapy if it had been administered to Michelle after her surgery in April 1998. Defendants argued that Dr. Goldstein did not have the requisite expertise and qualifications to offer such testimony. After conducting a *voir dire* hearing, the trial court found Dr. Goldstein was not an expert in medical oncology and would not be allowed to testify as to what the course of treatment would have been for Michelle and how she might have done had she received treatment sooner.

Dr. Goldstein then testified that he is board certified in obstetrics and gynecology and specializes in gynecologic oncology at Brigham and Woman's Hospital, where he primarily does surgery. He also works for the Dana-Farber Cancer Institute in Boston, where he does outpatient care. A large part of his testimony was about the FIGO staging system for cancer patients. He testified that all patients in a particular stage would be considered the same type, mostly for academic purposes, so if they were treated they should have similar outcomes. Dr. Goldstein described the following stages, in relevant part, as they relate to ovarian cancer patients: stage I would be a tumor localized to the ovaries; stage IA would be localized to one ovary; stage IB would involve both ovaries; stage IC would be one or both ovaries involved with some evidence of tumor cells in the abdominal cavity; and stage IV would be if there was evidence of the disease outside the abdominal cavity. When a pathologist concludes that a tumor is malignant, staging should be done which, depending upon the circumstances, entails washings, removing any tumors that appear on any structure, removing the omentum, taking scrapings, and sampling lymph nodes. It is a judgment call on the surgeon's part whether to stage a borderline tumor of the ovaries and

depends upon various factors. Most such borderline tumors, however, are staged.

Dr. Goldstein testified that Michelle had a stage IA or IC tumor, most likely a IA tumor, on April 8, 1998. His opinion, which he held within a reasonable degree of medical certainty, was based upon the following facts: Dr. Weiss explored the abdomen very thoroughly when he removed the tumor and found no evidence of any disease; 18 months after the operation when Michelle began to have symptoms of her recurrent tumor and a CT scan was done, no evidence of any tumor in her abdomen was found; and fluid inside a mucinous tumor is very gelatinous, and if the fluid gets into the abdominal cavity, it can cause a condition called "pseudomyxoma peritonei," where you have a gelatin-like development in the abdominal cavity, and there was no evidence of such a condition in Michelle's case. Based upon the FIGO statistics for ovarian cancer, a patient diagnosed with a stage IA tumor has about an 80% chance of survival, while a stage IC patient has a 70% to 75% survival rate, and a stage IV patient has less than a 10% survival rate. When Michelle was diagnosed with ovarian cancer in September 1999, it was behaving like a stage IV tumor because it was outside of the abdominal cavity in the lungs and the bone.

At the completion of plaintiff's case-in-chief, defendants moved for a directed verdict because plaintiff had failed to meet her burden on the issue of proximate cause. The trial court took the issue under advisement and instructed defendants to begin their case-in-chief. After defendants presented the testimony of three pathologists, including Dr. Robert Young, the trial court granted defendants' motion for a directed verdict. In doing so, the trial court concluded there was no opinion to a reasonable degree of medical certainty that the effectiveness of the treatment Michelle might have received after April 1998, was lessened. The trial court further

concluded there was no evidence that Michelle's stage IA cancer, if left untreated, would have progressed to a stage IV cancer within a certain amount of time. Finally, the trial court concluded there was no evidence which indicated what treatment Michelle would have been given which would have prevented her stage IA cancer from later progressing to Stage IV cancer, which was the cause of her death in September 2000.

Plaintiff raises the following three issues for our consideration: (1) whether the trial court abused its discretion by barring Dr. Goldstein's trial testimony concerning the potential efficacy of certain courses of cancer treatment if started earlier in this case; (2) whether the trial court erred by granting defendants' motion for a directed verdict; and (3) whether the trial court abused its discretion by prohibiting plaintiff from cross-examining defendants' pathology expert, Dr. Robert Young, about information he may have included in a pathology report if he had been Michelle's pathologist.

We first consider plaintiff's claim that the trial court abused its discretion by barring plaintiff's medical expert, Dr. Goldstein, from testifying as to the management, treatment, and/or effectiveness of any chemotherapy that may have been part of Michelle's treatment following her surgery in April 1998. Defendants assert that the trial court properly barred the testimony because Dr. Goldstein was not a medical oncologist and did not have the requisite experience with cancer treatment to support his opinions.

An expert witness is a person who, because of education, training, or experience, possesses specialized knowledge beyond the ordinary understanding of the jury. Hubbard v. Sherman Hospital, 292 Ill. App. 3d 148, 153 (1997). In medical malpractice cases, "[i]t must be

established that the expert is a licensed member of the school of medicine about which he proposes to express an opinion [citation] and the expert witness must show that he is familiar with the methods, procedures, and treatments ordinarily observed by other physicians, in either the defendant physician's community or a similar community." Purtill v. Hess, 111 Ill. 2d 229, 243 (1986); see also Gill v. Foster, 157 Ill. 2d 304, 316 (1993). Whether the plaintiff's medical "expert is qualified to testify is not dependent on whether he is a member of the same speciality or subspeciality as the defendant, but, rather, whether the allegations of negligence concern matters within his knowledge and observation." Jones v. O'Young, 154 Ill. 2d 39, 43 (1992). The trial court has the discretion to determine whether a person is qualified to testify as a medical expert and its determination will not be disturbed absent an abuse of discretion. Gill, 157 Ill. 2d at 317.

In Gill, the trial court barred the plaintiff's expert, Dr. McAfee, a board-certified general surgeon, from testifying that the defendant, a radiologist, had deviated from the standard of care in reading various films that were taken during the plaintiff's hospitalization. Gill,157 Ill. 2d at 315. Dr. McAfee testified that during the course of his career as a surgeon, he had training and experience in interpreting X-rays and had instructed medical students on the subject of radiology as it relates to surgery. Gill, 157 Ill. 2d at 315-16. He had also examined tens of thousands of X-rays and was familiar with the standard of care of a reasonably well-qualified radiologist. Gill, 157 Ill. 2d at 315-16. While affirming the underlying decision, the supreme court found the trial court abused its discretion by limiting Dr. McAfee's testimony. Gill, 157 Ill. 2d at 318. The plaintiff's witness, as a licensed doctor, could testify as an expert in the area of radiology, and to the standard of care of radiologists, even though he was not a practicing radiologist and lacked board

certification. Gill, 157 Ill. 2d at 317. His lack of board certification, and his occasional reliance upon radiologists' interpretations of X-rays in complicated cases, went to the weight of his opinion, and not to its admissibility. Gill, 157 Ill. 2d at 317.

Similarly, in Silverstein v. Brander, 317 Ill. App. 3d 1000 (2000), the trial court found the plaintiff's medical expert, Dr. Singer, an internist, unqualified to testify that the defendant physiatrist had violated the standard of care with regard to the management of the plaintiff during his rehabilitation from a hip replacement. Silverstein, 317 Ill. App. 3d at 1003-04. We reversed the trial court on the basis that Dr. Singer had worked on the medical management of more than 100 of his patients while they underwent physical rehabilitation following hip replacement surgery. Silverstein, 317 Ill. App. 3d at 1007. We directed the trial court to allow Dr. Singer to testify on remand as to the standards governing the medical management of postoperative patients because he demonstrated adequate expertise. Silverstein, 317 Ill. App. 3d at 1008.

In Hubbard v. Sherman Hospital, 292 Ill. App. 3d 148 (1997), relied upon by defendants, the trial court barred the plaintiff's proposed medical expert, Dr. Malachinski, who was not a surgeon, from rendering any opinions regarding allegations that the defendant doctor delayed the plaintiff's appendectomy procedure and diagnostic tests, or about the defendant's actual surgical performance. Hubbard, 292 Ill. App. 3d at 152-53. Dr. Malachinski had dealt with appendicitis patients as an attending physician, but not as a surgeon, and had only completed a one-month rotation as an intern in general surgery and had occasionally assisted in surgeries. Hubbard, 292 Ill. App. 3d at 153. We found the trial court did not abuse its discretion in limiting Dr. Malachinski's testimony on the basis that he was not qualified to render expert opinion concerning

the surgeon's performance or any possible delay in scheduling testing or the surgical procedure. Hubbard, 292 Ill. App. 3d at 154-55.

In Northern Trust Co. v. Upjohn Co., 213 Ill. App. 3d 390 (1991), also relied upon by defendants, the plaintiff was treated with an intrauterine injection of an abortion-inducing drug. Northern Trust, 213 Ill. App. 3d at 395. Thereafter, the plaintiff's blood pressure rose dramatically, she suffered nausea, and experienced an irregular pulse. Northern Trust, 213 Ill. App. 3d at 395. The defendant obstetrician instructed a nurse to continue monitoring the patient closely and left the room. Northern Trust, 213 Ill. App. 3d at 395. A short time later, the plaintiff suffered a cardiac arrest and sustained a brain injury. Northern Trust, 213 Ill. App. 3d at 396. The plaintiff tendered a specialist in emergency medicine, Dr. Matthews, as an expert witness in her suit against the obstetrician, the hospital, and the drug manufacturer. Northern Trust, 213 Ill. App. 3d at 406. Dr. Matthews was not an obstetrician or gynecologist, had never performed an abortion, and had never used the drug at issue or observed the reactions of a patient receiving the abortion-inducing drug. Northern Trust, 213 Ill. App. 3d at 406-07. We concluded that Dr. Matthews was not competent to testify as to the standard of care to be applied to the defendant obstetrician because his lack of actual experience made him unqualified to know what was the customary practice for someone in the defendant's position. Northern Trust, 213 Ill. App. 3d at 407. Consequently, we found the plaintiff had failed to present sufficient expert testimony to establish the standard of care and the breach of that standard, and reversed the judgment against the defendant obstetrician. Northern Trust, 213 Ill. App. 3d at 407.

Turning to the case at hand, the record establishes that the following relevant evidence was

presented during the *voir dire* hearing:  Dr. Goldstein has been board certified in obstetrics and gynecology since 1967.  He works as part of a group of six gynecologic oncologists at Brigham and Women's Hospital and the Dana-Farber Cancer Institute in Boston.  Dr. Goldstein also works with three medical oncologists with whom he collaborates during a weekly conference to discuss various issues surrounding a patient's status and cancer therapy.  While he refers patients to a medical oncologist for purposes of managing the chemotherapy and making the decision as to whether to give chemotherapy, including any experimental drugs, he also monitors the patient's response to the therapy.  Dr. Goldstein testified that carboplaitin and Taxol have been the standard first-treatment drugs for ovarian cancer for about 10 years.  He further testified that he would question a medical oncologist if any alternative course was suggested for one of his patients, and the medical oncologist would have to explain why a different agent was necessary.  Dr. Goldstein testified that an alternative chemotherapy is only used about 5% of the time, such as when a patient has an unusually adverse reaction to the standard drugs, and the medical oncologist would propose the alternative course.  However, in those cases where the standard drugs do not work or subsequent chemotherapies are used, Dr. Goldstein testified he is involved in the decision-making process as to what should be done.  While he would not make the ultimate decision, he testified it would be a "joint decision" whether to use something experimental or a second line of therapy.

Following the *voir dire* hearing, the trial court limited Dr. Goldstein's testimony on the basis that he was not qualified to give an opinion on what the course of treatment would have been for Michelle if her cancer had been staged in April 1998, or what the benefits and disadvantages to a course of therapy might have been.  The trial court concluded that Dr. Goldstein was not

sufficiently familiar with the decision-making process, and the methods medical oncologists use to select the course of therapy to administer, to allow his testimony. The trial court noted that there are cases when the standard therapy is not administered, and that there would be no way of knowing whether this was one of those cases, and defendants would lack the opportunity to cross-examine the doctor who determines the modality.

Like in Gill and Silverstein, we find the trial court abused its discretion by limiting Dr. Goldstein's testimony. As a licensed doctor with extensive experience in the management and treatment of cancer patients, Dr. Goldstein was qualified to testify as an expert concerning the potential course and efficacy of treatment if Michelle's cancer had been diagnosed sooner. Dr. Goldstein testified that he collaborates on a weekly basis with the hospital's medical oncologists; is familiar with the standard course of treatment for ovarian cancer patients; monitors the reaction of his patients to cancer therapies; questions a medical oncologist if an unusual course of therapy is suggested for one of his patients; and would be a joint decision maker in deciding whether something experimental, or a second line of therapy, should be administered to a cancer patient. Unlike the medical witnesses in Hubbard and Northern Trust, Dr. Goldstein demonstrated extensive experience in the management and treatment of cancer patients in order to allow him to testify about Michelle's potential treatment. Dr. Goldstein's lack of board certification in medical oncology and his reliance upon medical oncologists in determining a patient's ultimate treatment went to the weight of his opinion, not to its admissibility. See Gill, 157 Ill. 2d at 317.

Based upon our determination that the trial court abused its discretion by limiting Dr. Goldstein's testimony, we must determine whether the error constitutes grounds for a new trial.

1-05-0511

Errors in the exclusion of evidence may warrant a new trial where the errors are serious and prejudicial. Israel v. National Canada Corp., 276 Ill. App. 3d 454, 463 (1995). The party seeking reversal has the burden of establishing prejudice. Israel, 276 Ill. App. 3d at 463.

"To succeed on a claim of medical malpractice, a plaintiff must demonstrate: (1) the standard of care applicable to the defendant's actions; (2) the defendant's deviation from the appropriate standard of care; and (3) the deviation from the standard of care proximately caused the plaintiff's injuries." McDaniel v. Ong, 311 Ill. App. 3d 203, 208 (1999). Proximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible. Townsend v. University of Chicago Hospitals, 318 Ill. App. 3d 406, 413 (2000).

We agree with the trial court that the evidence presented by plaintiff to the jury was insufficient, as a matter of law, to show that Dr. Murad's alleged deviation from the standard of care resulted in a decreased chance of survival due to a delay in starting Michelle's treatment. Pedrick v. Peoria & E.R.R. Co., 37 Ill. 2d 494, 510 (1967) (a directed verdict is appropriate only where all of the evidence, when viewed in the aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based upon the evidence could ever stand).

The record establishes, however, that Dr. Goldstein provided the following opinion contained in plaintiff's Supreme Court Rule 213 (Official Reports Advance Sheet No. 8 ( 2002), R. 213, eff. July 1, 2002) discovery disclosures:

"In summary, it is my opinion to a reasonable degree of

-15-

medical certainty that Dr. Murad's failure to diagnose and report invasive mucinous cancer and lympho-vascular invasion in April,1998, resulted in an 18+ month delay in providing chemotherapy and other diagnostic and potentially therapeutic treatment, substantially reduced Ms. Ayala's chance of surviving her cancer, reduced her life expectancy, lessened the effectiveness of treatment once it was finally initiated, and resulted in substantial medical expenses, and pain and suffering in the year prior to decedent's death."

This opinion was consistent with Dr. Goldstein's subsequent *voir dire* testimony elicited during the hearing on defendants' motion *in limine*. At the hearing, Dr. Goldstein testified that the standard primary treatment for ovarian cancer for approximately the last ten years was carboplatin and Taxol; the normal cycles for the administration of carboplatin and Taxol would initially be six treatments at three week intervals; such treatment constituted the standard of care for gynecologic and medical oncologists who administer chemotherapy for ovarian cancer; and that Michelle's cancer should have been diagnosed and she should have received such treatments of carboplatin and Taxol. Dr. Goldstein later testified at trial that he believed, within a reasonable degree of medical certainty, that Michelle most likely had a stage IA tumor in April 1998, which had a FIGO survival rate of 80%, and that by September 1999, her cancer had reached stage IV, which had a FIGO survival rate of less than 10%. Dr. Goldstein, however, could only testify in general terms about the FIGO staging system as he was not allowed, based upon the trial court's ruling on

defendants' motion *in limine*, to testify as to what the course of treatment for Michelle would have been, and how she might have done had she received treatment sooner, and to connect the FIGO statistics to Michelle's case.  For the foregoing reasons, we find plaintiff has met her burden that the trial court's error in limiting Dr. Goldstein's testimony was prejudicial to her cause in that it precluded her from showing that Dr. Murad's alleged deviation from the standard of care proximately caused her injuries.  Accordingly, we remand for a new trial.

Finally, we turn to plaintiff's claim that the trial court abused its discretion by limiting her cross-examination of defense witness Dr. Robert Young, who testified after the trial court took defendants' motion for a directed verdict under advisement.  We will consider plaintiff's claim for purposes of the admissibility of the challenged testimony on remand.

The record establishes that when the trial court ruled on various objections made to the evidence deposition of defendant's pathology expert, Dr. Young, it struck the following testimony provided during plaintiff's cross-examination of the witness:

"Q. You would have mentioned the cancer and stroma

invasion written in the report to Michelle Ayala's gynecological

oncologist, wouldn't you?

A. Yes."

The trial court struck this testimony because it related to the personal practices of Dr. Young and did not concern a deviation from the applicable standard of care.

The admission of evidence falls within the discretion of the trial court and will not be reversed on review absent an abuse of discretion.  Brax v. Kennedy, 363 Ill. App. 3d 343, 355

-17-

(2005).  We explained in <u>Glassman v. St. Joseph Hospital</u>, 259 Ill. App. 3d 730 (1994):

     "[O]ur supreme court [in <u>Walski v. Tiesenga</u>, 72 Ill. 2d 249

     (1978),] established that evidence that another doctor would have

     acted differently was not sufficient to show that the defendant

     doctor breached the standard of care.  An expert's statements that

     he would have acted differently are not even relevant 'because

     differences in opinion are consistent with the conformity to the

     applicable standard.' " <u>Glassman</u>, 259 Ill. App. 3d at 752, quoting

     <u>Mazzone v. Holmes</u>, 197 Ill. App. 3d 886, 898 (1990).

As in <u>Glassman</u> and <u>Mazzone</u>, Dr. Young's testimony here did not concern the applicable standard of care, but constituted evidence of what he would have done as Michelle's pathologist. While we recognize the Fourth District Appellate Court disagreed with <u>Mazzone</u> in <u>Gallina v. Watson</u>, 354 Ill. App. 3d 515, 520 (2004), we see no reason to reconsider the holdings of the First District Appellate Court on this issue, and find the trial court did not abuse its discretion by limiting plaintiff's cross-examination of Dr. Young.

Accordingly, the judgment of the circuit court of Cook County is reversed and remanded with direction for a new trial consistent with this opinion.

Reversed and remanded with directions.

HALL, J., concurs.

WOLFSON, P.J., specially concurs.

1-05-0511

PRESIDING JUSTICE WOLFSON, specially concurring:

I agree the trial court committed reversible error when it limited Dr. Goldstein's testimony, and I agree a new trial is warranted, but I do not agree with the majority's position on Dr. Young's stricken testimony concerning whether he would have mentioned cancer and stroma invasion to Michelle Ayala's gynecological oncologist.

It is true that an expert cannot be asked about his own conduct in order to establish a defendant doctor's deviation from or adherence to the standard of care. See Glassman v. St. Joseph Hospital, 259 Ill. App. 3d 730 (1994). But that was not the point of the question asked of Dr. Young. Counsel was trying to attack the persuasive value of Dr. Young's opinions. It was an attack on his credibility. That is permissible. See Gallina v. Watson, 354 Ill. App. 3d 515, 521 (2005). If opposing counsel fears jury misuse of the testimony, a limiting instruction can be used to confine the jury to a proper consideration of the evidence.

19