NOTICE

Decision filed 07/30/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 190272-U

NO. 5-19-0272

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| TONYA MONROE and STEVEN MONROE, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellants, | ) | Madison County. |
| | ) | |
| v. | ) | No. 11-L-403 |
| | ) | |
| DR. SARA CANNON, ST. ANTHONY'S HEALTH CENTER, and ILLINI MEDICAL ASSOCIATES, S.C., | ) ) ) | |
| | ) | |
| Defendants | ) | Honorable |
| | ) | Stephen A. Stobbs, |
| (St. Anthony's Health Center, Defendant-Appellee). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE WELCH delivered the judgment of the court.
Justices Overstreet and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's denial of the plaintiff's motion for judgment notwithstanding the verdict is affirmed where the expert testimony presented at trial supports the jury's verdict and its denial of the motion for new trial is affirmed where the court did not abuse its discretion.

1

¶ 2    This appeal arises from a claim of medical malpractice. The plaintiff, Tonya Monroe,[1] brought this action seeking damages for a tear in her bladder resulting from a diagnostic laparoscopy performed by Dr. Sara Cannon on May 1, 2009. Following a jury trial, a verdict was returned in favor of the defendants, Dr. Sara Cannon and St. Anthony's Health Center (St. Anthony's).[2] The plaintiff filed a motion for judgment notwithstanding the verdict (judgment *n.o.v.*) and a motion for new trial. The trial court denied both posttrial motions. The plaintiff appeals.

¶ 3    As there was a significant amount of evidence introduced at trial that has no bearing on this appeal, we will only include those facts related to the following issues raised by the plaintiff: (1) whether judgment *n.o.v.* was appropriate where the evidence so overwhelming favored her claim that no contrary verdict could ever stand, (2) whether the court abused its discretion in denying the plaintiff's motion for new trial where the jury's verdict was against the manifest weight of the evidence, and (3) whether the court abused its discretion in denying the plaintiff's motion for new trial where the court failed to answer a question posed by the jury during deliberations. For the following reasons, we affirm.

¶ 4                          I. BACKGROUND

¶ 5    The original complaint in this case was filed on April 28, 2011. The plaintiff sought damages against St. Anthony's for injuries she suffered during a diagnostic laparoscopy—

---

[1]The plaintiff's husband, Steven Monroe, is also a named plaintiff. However, as all of the relevant facts relate to Tonya's medical treatment, she will be referred to in the singular as the plaintiff for ease of reading.

[2]This appeal relates only to the judgment against St. Anthony's Healthcare. The verdict in favor of Dr. Cannon is not included in this appeal, and she will therefore be referred to by name for ease of reading.

performed by Dr. Cannon—and her postoperative care at the facility on May 1 and 2, 2009. Following years of extensive discovery, the plaintiff filed a third amended complaint on July 17, 2017, alleging, in pertinent part, that St. Anthony's was negligent in treating her where the nursing staff infused her fluids at twice the rate ordered by Dr. Cannon postsurgery and where the nursing staff failed to notify Dr. Cannon of a "dangerous and obvious discrepancy" between the amount of fluids infused into the plaintiff compared to the amount of fluid she output prior to discharge. On January 23, 2019, a jury trial commenced.

¶ 6                                A. Jury Trial

¶ 7     Dr. Sara Cannon testified that in 2009 she was the plaintiff's gynecologist. The plaintiff's prior medical history included a diagnosis of polycystic ovarian syndrome, delivery of a child via cesarean section, and gall bladder removal. At the time, the plaintiff was complaining of persistent pain in the lower left quadrant of her abdomen. Dr. Cannon first prescribed several types of birth control as the pelvic pains seemed to be related to her menstrual cycle; however, the plaintiff continued to experience pain. On May 1, 2009, Dr. Cannon performed a diagnostic laparoscopy to try and find the source of the plaintiff's pelvic pain. During the procedure, Dr. Cannon noticed adhesions on the omentum that were adherent to the anterior abdominal wall, adhesions on the ovaries, endometriosis in the ovaries, severe scarring of the bladder to the uterus, and scarring on the ovaries. She noted there was no endometriosis involving the bladder. She lysed the adhesions between the bladder and the ovaries to reduce tension between the two organs. She did not operate on the plaintiff's bladder. It was her opinion that the tear to the plaintiff's bladder did not

3

occur during surgery because the location of the tear was on the opposite side from the surgery site.

¶ 8    After the surgery, the plaintiff was experiencing pain, nausea, and an inability to urinate on her own. Dr. Cannon ordered Zofran to treat the nausea, Toradol to treat the pain, and ordered a catheter be inserted to help with the lack of urination. The nausea went away once medication was administered and the catheter returned 200 milliliters of clear, yellow urine. Eventually, Dr. Cannon decided that the plaintiff needed to be admitted overnight. After the plaintiff was admitted, she once again was unable to urinate and a Foley catheter was inserted. Dr. Cannon also ordered that the plaintiff be infused with fluids at a rate of 150 milliliters per hour.

¶ 9    The following morning, the plaintiff urinated twice on her own producing 250 milliliters of clear yellow urine, reported her pain to be a level 2 out of 10, and requested that she be discharged. Laura Pratt, the on-duty nurse, informed Dr. Cannon of the plaintiff's status and her desire to be discharged. Because Dr. Cannon believed the plaintiff's postoperative symptoms had resolved within a reasonable time, she approved the discharge order.

¶ 10    At the time of discharge, Dr. Cannon was informed that the plaintiff had a fluid imbalance of 1000 milliliters in excess, which did not give her cause for concern. However, she later learned through this case's litigation process that she was misinformed by the nursing staff and there were 3500 milliliters of excess fluid in the plaintiff's system. She testified that had she been told the accurate amount of excess fluid, she would have kept the plaintiff for observation and assessment to make sure there were no other symptoms

4

that would indicate a surgical complication. However, regardless of what additional precautions she might have taken, the plaintiff's postsurgery symptoms resolved, and the plaintiff was able to urinate and had a pain level of two. Therefore, it was Dr. Cannon's opinion that the tear did not occur until after the plaintiff was discharged.

¶ 11 Approximately eight hours after being discharged, on the night of May 2, the plaintiff called Dr. Cannon's answering service, and Dr. Timothy Kissabeth, the on-duty physician, returned her call. The plaintiff complained of nausea and vomiting, so Dr. Kissabeth called in a prescription for antinausea medication.

¶ 12 On May 5, after speaking with the plaintiff, Dr. Cannon suspected a possible infection, and she directly admitted the plaintiff to St. Anthony's. There, it was discovered that she had a blood clot in her leg that was unrelated to the surgery. The blood clot required a blood transfusion, so she was air-lifted to Barnes-Jewish Hospital in St. Louis (Barnes). Based on the results of a computerized tomography (CT) scan, Dr. Jon Kirby, a surgeon at Barnes, suspected a bladder injury and on May 7 performed exploratory surgery and found necrotic tissue in her abdomen and a bladder perforation.

¶ 13 Dr. Henry Prince was called as an expert witness by the plaintiff. He testified that he was a board-certified obstetrician/gynecologist. He testified that where a patient has severe scarring, such as the plaintiff, it can be difficult to differentiate what is scar tissue, what tissue is part of the bladder, and what tissue is part of the uterus. When a person has severe scarring, therefore, there is a possibility that a diagnostic laparoscopy can damage the bladder. He explained that the bladder has a wall with three layers. When operating on severe scarring and adhesions, it is easy to damage or interrupt the wall. It is possible

5

to thin the wall without fully perforating it. He noted that the excess 3500 milliliters of fluid was a grave concern and was not properly charted by the nursing staff. He opined that knowledge of that kind of fluid imbalance would raise concern that the patient has suffered a bladder injury. It was his medical opinion that the tear in the plaintiff's bladder occurred prior to her discharge on May 2. It was also his opinion that it was the responsibility of the nursing staff to maintain accurate records and that they should have informed Dr. Cannon of the 3500 milliliters of excess fluid. He also pointed out that the nursing staff infused fluids into the patient postsurgery at a rate greater than what was prescribed by Dr. Cannon, which put the plaintiff at risk of a bladder rupture. He theorized that had Dr. Cannon been properly informed of the fluid imbalance by the nursing staff, she would have further examined the patient, which would have given her the opportunity to find the rupture four days sooner.

¶ 14 Sister Angelica Neuman, St. Anthony's former vice president of patient care services, testified that in May 2009, she was responsible for setting the care standards at St. Anthony's for all of the inpatient units and some of the outpatient units. It was St. Anthony's policy that nurses keep consistent and accurate records. She characterized medical records as a tool that assists in providing treatment and opined that proper use of the record was part of the standard of care in nursing. The record keeping policy included accurately and consistently recording the amount of lactated ringers infused into a patient; however, Sister Neuman elaborated that the nurses were required to report significant changes in the patient's condition and that the inputs and outputs (INOs) of an inpatient are less significant because the patient need only be able to tolerate fluids and urinate on

their own in order to be discharged. Alternatively, the INOs become more significant for an outpatient and therefore should be more closely monitored.

¶ 15    After having the opportunity to review the plaintiff's entire medical chart, Sister Neuman  was able to calculate that at the time of discharge there was 3500 milliliters of excess fluid in the patient's system. She agreed that when nurse Laura Pratt misinformed Dr. Cannon about the fluid imbalance, she violated the standard of care. She agreed that St. Anthony's nursing staff also violated the standard of care by not infusing the six bags of lactated ringers at the rate ordered by Dr. Cannon. Overall, it was her opinion that, at the time the plaintiff was discharged, her symptoms did not necessarily raise cause for concern. She explained that, "In a post-op patient they're going to have pain. They may have nausea. And being able to void is sometimes, as the anesthesia wears off, it takes a while for the body to wake up, if you will, and be able to void." Also, though the discrepancy in the amount of excess fluid was an important piece of information that should have been communicated to Dr. Cannon, the fluid imbalance would be less of a concern in a young healthy patient such as the plaintiff.

¶ 16    Anne Meyer, a registered nurse, was called as an expert witness by the plaintiff. She testified that the standard of care requires one to act as any nurse would in the same or similar situation and is not a fixed standard. Considering the totality of the plaintiff's symptoms, it was her opinion that the plaintiff was not stable enough to have been discharged because she was having trouble urinating on her own, she had a significant amount of excess fluid in her system, she did not have any bowel sounds, and she was still in a significant amount of pain. With regards to the fluid imbalance, the standard of care

required the nursing staff to relay accurate information to a doctor, and failing to do so, as was the case here, is a violation of the standard of care.

¶ 17   Dr. Tim Kissabeth testified that he was one in a group of doctors with a call coverage arrangement where the doctors set a schedule amongst themselves to ensure there was always a doctor available to patients.   On the night of May 2, he was the available physician, and he spoke to the plaintiff.   She explained that she had recently undergone a laparoscopic procedure.   Currently, she was experiencing extreme nausea and vomiting. Based on the information provided by the plaintiff, he did not think there was any reason to suspect a bladder injury.   He asked her several diagnostic questions, and she reported that her stomach was soft, indicating no infection or peritonitis.   She did not have a fever and there was no redness extending away from her incisions, further indicating that she did not have an infection.   His diagnostic opinion was that the plaintiff had postoperative nausea, and he prescribed an antinausea medication.

¶ 18   Dr. Kirby was brought in on a surgery consult with the plaintiff after she was complaining of worsening abdominal pain and had a CT scan.   Her abdomen was diffusely tender with guarding and rebound.   He suspected a bladder injury.   The plaintiff was taken in for exploratory surgery where it was discovered that she did in fact have a tear in her bladder causing intraperitoneal fluid, along with a distended bowel and necrotic material in the perivascular space.

¶ 19   Dr. Casey Younkin, an obstetrician/gynecologist, was called as an expert witness by the defense.   Based on his review of the records, it was his opinion that the plaintiff's bladder rupture occurred in the interval between her call to Dr. Kissabeth on the night of

8

May 2 and her admittance to St. Anthony's on May 5. The opinion was based on the fact that her medical records indicate that she got better during her first stay at St. Anthony's. If there was a tear in her bladder, her symptoms would not have weaned and waned. She would not have gotten better; she would have only gotten progressively worse during her stay. Also, narcotics do not affect the kind of pain caused by a bladder rupture; therefore, her positive reaction to the narcotics she was given for pain indicates that her bladder was still intact at that point. The morning of May 2 she was able to urinate on her own twice and asked to be discharged. The night she reported to Dr. Kissabeth that she was able to urinate on her own, she did not have a fever, and she described her abdomen as soft. Her main complaint to Dr. Kissabeth on the night of May 2 was nausea as she was seeking a prescription for nausea medication. It was Dr. Younkin's opinion that the surgery caused the plaintiff's bladder to ultimately rupture; however, he believed that the rupture occurred after her phone call with Dr. Kissabeth on the night of May 2. With regard to the plaintiff's fluid imbalance, he explained that an excess balance over 3000 milliliters should be further examined as it can be a sign of fluid overload; however, he did not think that the excess fluids were related to the bladder injury because excess fluid alone, without other symptoms, would not indicate a tear in the bladder.

¶ 20    The plaintiff and her husband both testified to the fact that the plaintiff's symptoms were the same from the time of her discharge on May 2 until the time of her admittance on May 5. The plaintiff testified that her symptoms were constant and only got worse through the days she was home. It was her contention that since her symptoms dated back to May 2, the tear occurred during her surgery or shortly thereafter during her postsurgery stay.

9

With reference to her ability to urinate, she explained that she was "tinkling" each time and that she was not able to pass a significant amount of urine without a catheter.

¶ 21 Dr. Andrew Steele, a urogynecologist, was called as an expert witness by the defense. Based on his review of the records, it was his opinion that the tear to the plaintiff's bladder occurred sometime after her discharge on May 2. In support of his opinion, he noted that at the time of discharge, the plaintiff was urinating an adequate amount of urine on her own. He also explained that if the tear did occur on May 1 or 2, the plaintiff would have deteriorated quickly, and she would have needed to readmit herself sooner than May 5. The timeline of her symptoms indicated that the rupture occurred after her discharge.

¶ 22 Sara Medford, a day nurse at St. Anthony's at the time of the plaintiff's operation, testified that she treated the patient postsurgery. The first time she visited the plaintiff, she made a note that she assisted the plaintiff to the bathroom, but the plaintiff was unable to urinate. She also noted 200 milliliters of greenish emesis, that the plaintiff reported a pain level of 10 out of 10 and nausea, and that the plaintiff was drowsy, dizzy, and had an unsteady gait. She called Dr. Cannon and reported that the plaintiff had vomited, was in a lot of pain, and was very nauseated. An hour and 20 minutes after the first visit, per Dr. Cannon's order, the plaintiff had a straight catheter inserted because she was unable to urinate. The straight catheter returned 200 milliliters of clear yellow urine. A short while later Medford administered Toradol to the plaintiff for pain, checked that her fluids were infusing, and noted that she denied any nausea. Medford spoke to Dr. Cannon for a second time and updated her on the plaintiff's condition. Dr. Cannon ordered that the plaintiff was to be kept until she was able to urinate. If the plaintiff did not urinate for six hours, they

were to implant a Foley catheter and admit her overnight. Medford passed along Dr. Cannon's orders to her supervisor and turned the plaintiff over to an obstetrics nurse. The plaintiff did not show any signs of a bladder leak during the time she was attended to by Medford.

¶ 23   Laura Pratt testified that she was a nurse at St. Anthony's hospital in May 2009 and treated the plaintiff on the morning of May 2. She recalled that immediately upon entering the plaintiff's room for the first time, the plaintiff told her that she wanted to be discharged. She assessed the plaintiff and checked her vital signs, which were all normal. She discontinued the Foley catheter, recorded that it returned 400 milliliters of clear urine, and noted that the plaintiff's pain level was a 4 out of 10. She reported that the trocar sites were healing and did not report seeing any distension in the plaintiff's abdomen. Once the Foley catheter was removed, she noted that the plaintiff urinated twice, producing a total of 250 milliliters of clear yellow urine. The plaintiff again asked her to contact Dr. Cannon because she wanted to be discharged. Pratt spoke to Dr. Cannon, updated her on the plaintiff's condition, and Dr. Cannon approved the discharge order. For discharge, Dr. Cannon ordered that if the plaintiff could not urinate for six hours, she was to call her doctor or report to the emergency room for evaluation. Pratt then discontinued the plaintiff's intravenous line (IV), noted that her pain was a level 2 out of 10, checked her vitals (which were all normal), administered a bandage, and discharged the plaintiff via wheelchair in a stable condition. At no time did Pratt see any signs or symptoms that indicated the plaintiff had a bladder leak.

¶ 24 Dr. Marianne Curia was called as an expert witness by the defense. She testified that based on her review of the records, she was critical of the nurses in charge of the plaintiff's care for failing to set the fluid flow rate at 150 milliliters per Dr. Cannon's order (at one point the rate was more than double Dr. Cannon's order). It was also her opinion that Pratt should have reported the 3500 milliliter fluid imbalance (which Dr. Curia had to calculate herself because the nurses at St. Anthony's failed to keep track of the INOs and as such were unaware of the actual amount of excess fluid in the plaintiff's system when she was discharged). However, it was also her opinion that none of the nurses breached the standard of care in treating the plaintiff. Her opinion was based on the fact that the nurses were familiar with postsurgery procedure, did all of the necessary assessments, and regularly updated Dr. Cannon about the plaintiff's condition.

¶ 25 Dr. Michael Moen, a urogynecologist, was called to testify as an expert witness by the defense, particularly about the causal link between the plaintiff's surgery and her subsequent injury. He opined that the plaintiff did not have a perforation in her bladder at the time of surgery or her subsequent stay at St. Anthony's. He specifically focused on the records and data pertaining to the postsurgery hospital stay and came to the conclusion that at no time during her stay was the plaintiff's bladder perforated. His opinion was based on the fact that the records did not indicate anything out of the ordinary in terms of the course of her recovery. Pain and nausea postsurgery are both common symptoms, they were managed and treated by the hospital staff, and eventually the nausea went away and her pain level dropped to a 2 out of 10, which was the expected result of the medications. Her vitals remained normal the entire time, and the catheters produced tremendous amounts of

urine (indicating there was not a hole in the bladder through which fluid was escaping). There was nothing to indicate any other problems outside of the normal symptoms of recovery from surgery. After she was able to urinate on the morning of May 2, she met all of the criteria for discharge and requested to be sent home. Additionally, with regard to the excess fluids in the plaintiff's system, he explained that the main concern with excess fluid is fluid overload, not injury to the bladder. Also, the rate at which the fluids were infused would not affect the bladder because the rate of flow of fluid from the IV would not affect the rate at which the kidneys processed fluid. The excess fluid may have in fact contributed to her feeling better on the morning of May 2 before discharge, but regardless, it did not cause any harm to the plaintiff.

¶ 26    It was Dr. Moen's opinion that the bladder was perforated on May 4 or 5. This was based on the fact that the tissue breakdown and necrosis discovered at Barnes was related to the bladder injury. Working backwards from the time of the CT scan at Barnes—which confirmed that her bladder was perforated—it would take between 12 and 24 hours to develop symptoms once the urine started leaking into the abdominal cavity. Therefore, if the bladder was already perforated when she checked in at St. Anthony's on May 5, then the injury occurred on the fourth. The latest that the injury occurred was the fifth because the diagnosis was confirmed by Barnes on the sixth.

¶ 27                                B. Jury Deliberation

¶ 28    On February 4, 2019, the case was given to the jury. During deliberations, the trial court was informed twice by the jury that it was deadlocked and could not agree on a verdict. The court instructed the jurors on both occasions to continue with their

13

deliberations. Thereafter, the court received a note from the jury asking whether "According to the definition of 'proximate cause' based on the belief that any of the Plaintiffs' claims against St. Anthony's are considered negligent, would a <u>missed opportunity</u> due to failing to notify the doctor in order to further assess prior to discharge on May 2 be a contributing cause under <u>proximate cause</u>?" The following colloquy occurred regarding how the question should be answered:

> "[THE PLAINTIFF]: Yes is the answer.
> THE COURT: I don't—what's—what's—I don't know that that's how we can answer it.
> [THE DEFENDANT]: Yeah.
> THE COURT: I mean, I don't know. How—how do you propose we answer it? I mean—
> [THE DEFENDANT]: I think, Your Honor—well, I'm sorry.
> [THE PLAINTIFF]: No, go ahead.
> [THE DEFENDANT]: Yeah I think the appropriate thing to do is refer the, to the jury instructions, that there's [*sic*] definition of 'proximate cause,' that they have to read the instruction and make their determination based on that and the facts.
> THE COURT: I mean, they're asking me what I think a proximate cause is, and what I think isn't important because I'm not a finder of the facts.
> [THE PLAINTIFF]: Well, except you instruct them on what the law means as to—
> THE COURT: The law means that proximate cause is any cause that may contribute to the underlying condition. But I'm not a finder of fact. I can't say, oh, factually you're correct.
> [THE PLAINTIFF]: You can say proximate cause is any cause. You can write that answer. Proximate cause is any cause.
> THE COURT: Didn't we really give them the answer in the instruction?
> [THE PLAINTIFF]: You know, Judge, I agree with that except for I think what they want is they want you to answer that question.
> THE COURT: They want to know what I think. I don't think that—
> [THE PLAINTIFF]: Oh, but you're not—
> THE COURT: Unless you guys want to waive the jury and have me decide the case.
> [THE PLAINTIFF]: Well, I would love that, but, Your Honor, I don't think you answering the way you just said gives them any guidance about whether to rule one way or the other. You're simply saying this is what proximate cause is.

14

THE COURT: Well, I don't mind really—I don't mind answering the question by, you know, reissuing the proximate cause instruction that they already have. I don't—I don't think that I should be giving them separate instructions from what they have.

[THE PLAINTIFF]: Well, maybe we can direct them to the specific answer that needed the jury instruction.

THE COURT: You have your instruction on proximate cause. The Court refers you to that instruction.

[THE PLAINTIFF]: Right.

[THE DEFENDANT]: I think that's appropriate—

THE COURT: I mean, that's—

[THE DEFENDANT]: —to handle it.

THE COURT: That's the answer. The answer isn't whether I think it is or isn't because that's—I think it's inappropriate if I tell them what I think.

* * *

THE COURT: [The question is reread.]—see, that's a fact—

[THE PLAINTIFF]: Yeah, I agree.

THE COURT: —that's a question of fact.

[THE PLAINTIFF]: I agree.

THE COURT: —'in order to further assess prior to discharge on May 2nd.' You know, part of the same fact—

[THE PLAINTIFF]: Right.

THE COURT: —question.

—'be a contributing cause under proximate cause.'

[THE PLAINTIFF]: Okay.

THE COURT: 'Please circle and explain yes or no.' Well, those are—that's a factual question they'll have to decide, but—so I think—I think the way to answer it is to tell them you have your instruction on proximate cause.

* * *

THE COURT: Okay. The only thing I'll say is I do think the Supreme Court is trying to get us to answer these as much as we can, you know, versus the—the old system of just refer to your instructions. I mean, you know—

[THE PLAINTIFF]: That's why I said—

THE COURT: —they are trying to do more

[THE PLAINTIFF]: —that's why I say—I said you saying 'proximate cause' means this, you're not giving them any instruction. You're just telling them—

THE COURT: Okay.

* * *

THE COURT: So, [they] should refer to [their] instruction on proximate cause.

Cause, I mean, they have to determine that. They have to read through that and apply the fact. You know, they have to determine if that fact, you know, is or isn't true in their mind—

15

[THE DEFENDANT]: That's correct.
THE COURT: —you know, and then apply it to the law."

The court then returned the note to the jury and instructed them to refer to the jury instruction on proximate cause.

¶ 29　The jury returned a verdict finding for St. Anthony's. The plaintiff filed a posttrial motion for judgment *n.o.v.* and a motion for new trial, both of which the trial court denied. The plaintiff appeals.

¶ 30　　　　　　　　　　　　II. ANALYSIS

¶ 31　Initially, we address the defendant's request to strike the plaintiff's brief for failing to comply with Illinois Supreme Court Rule 341(h) (eff. July 1, 2008), which sets out the requirements for appellant briefs. Where an appellant's brief violates the requirements of our supreme court rules, the appellate court has the discretion to strike the brief and dismiss the appeal or disregard the appellant's arguments. *Carter v. Carter*, 2012 IL App (1st) 110855, ¶ 12. However, where the violations of supreme court rules are not so flagrant as to hinder or preclude review, the striking of a brief in whole or in part may be unwarranted. *Id.*

¶ 32　The defendant maintains that the plaintiff's brief fails to state the facts accurately and fairly without argument or comment, in violation of Illinois Supreme Court Rule 341(h)(6) (eff. July 1, 2008). The defendant is correct to the extent that the plaintiff's statement of facts fails to address much of the evidence presented at trial. Although the defendant does not mention it, we also note that the plaintiff's brief violates Illinois Supreme Court Rule 341(h)(9) (eff. July 1, 2008), which requires an appendix including

"a complete table of contents, with page references, of the record on appeal." See Ill. S. Ct. R. 342(a) (eff. Jan. 1, 2005). To the extent that the plaintiff's brief does not comply with Rules 341(h) and 342(a), those violations do not hinder our review of the case, because we have the benefit of a complete record before us, as well as the defendant's citations to the record on appeal. Accordingly, we decline to strike the plaintiff's brief. *Carter*, 2012 IL App (1st) 110855, ¶ 12.

¶ 33 The plaintiff raises three issues on appeal: (1) whether the trial court erred in denying the plaintiff's motion for judgment *n.o.v.* where the evidence so overwhelming favored the plaintiff that no contrary verdict could stand; (2) whether the court clearly abused its discretion in denying the plaintiff's motion for new trial where the jury's verdict was contrary to the manifest weight of the evidence; and (3) whether the court abused its discretion in denying the plaintiff's motion for new trial where it refused to answer a question posed by the jury during deliberations.

¶ 34 In order to succeed on a claim of medical malpractice, plaintiff must establish: "(1) the standard of care applicable to the defendant's actions; (2) the defendant's deviation from the appropriate standard of care; and (3) the deviation from the standard of care proximately caused the plaintiff's injuries." *McDaniel v. Ong*, 311 Ill. App. 3d 203, 208 (1999). "Proximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Ayala v. Murad*, 367 Ill. App. 3d 591, 601 (2006) (citing *Townsend v. University of Chicago Hospitals*, 318 Ill. App. 3d 406, 413 (2000)). Whether a deviation from the standard of care was the proximate cause of

17

plaintiff's injury is a question of fact for the jury. *Borowski v. Von Solbrig*, 60 Ill. 2d 418, 423 (1975).

¶ 35 This court will not disturb the findings of a jury unless, "considering all the evidence in a light most favorable to the prevailing party, the jury's conclusion is palpably erroneous and wholly unwarranted." *Perry v. Murtagh*, 278 Ill. App. 3d 230, 239 (1996) (citing *McCall v. Chicago Board of Education*, 228 Ill. App. 3d 803, 806 (1992)). A jury's verdict will not be set aside merely because a different conclusion or outcome is conceivable. *Id.* "[A] reviewing court will not sit as a second jury to consider the nuances of the evidence or demeanor and credibility of the witnesses." *Id.* Even if the evidence presented at trial is uncontradicted, that is not a basis for overturning the jury's verdict if it is reasonable that the jury might have doubted the credibility or accuracy of the witnesses' testimony. *Id.*

¶ 36 First, the plaintiff contends that the trial court erred in failing to enter judgment *n.o.v.* where the evidence overwhelmingly favored the plaintiff and, therefore, a contrary verdict cannot stand. "A directed verdict or [judgment *n.o.v.*] should be granted only when 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' " *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 100 (2010) (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). A trial court's decision denying a judgment *n.o.v.* is reviewed *de novo*. *Id.*

¶ 37 Here, we note at the outset that it is undisputed that the nursing staff at St. Anthony's did not accurately inform Dr. Cannon about the plaintiff's fluid imbalance prior to discharge and did not infuse the plaintiff with fluids at the rate ordered by Dr. Cannon.

18

However, the jury's verdict demonstrates that it did not believe that the nurses' conduct was a proximate cause of the plaintiff's bladder injury. Our analysis should not determine whether there was evidence to support the plaintiff's claim. Instead we must focus on whether the evidence, viewed in the light most favorable to the defendant, so overwhelmingly favors the plaintiff that the verdict was wholly unwarranted.

¶ 38    The defendant's main contention at trial was that the conduct of the nurses at St. Anthony's was unrelated to the plaintiff's bladder injury. In defense of this assertion, the defense called three expert witnesses. Doctors Steele, Younkin, and Moen all testified to the following: (1) that the excess fluid in the plaintiff's system did not contribute to her injury; (2) there was no harm caused by the rapid infusion flow settings; (3) when the plaintiff was discharged on May 2 her bladder was intact; and (4) the injury occurred sometime later, when she was no longer under the care of St. Anthony's nursing staff.

¶ 39    The jury's verdict is consistent with the opinions of the defense's experts and therefore is not wholly unwarranted and must stand. The trial court did not err in denying the plaintiff's motion for judgment *n.o.v*.

¶ 40    Next, the plaintiff argues that the trial court abused its discretion in denying the motion for new trial where the jury's verdict was against the manifest weight of the evidence. "A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence." (Internal quotation marks omitted.) *Id*. at 101 (quoting *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992)). This court will not disturb the

19

trial court's ruling unless it is affirmatively shown that the lower court clearly abused its discretion in so ruling. *Id.*

¶ 41 There was ample evidence presented at trial that the bladder rupture occurred several days after the plaintiff was discharged. As previously discussed, there were multiple experts presented by the defense to support the jury's verdict. This was a straightforward "battle of the experts" case. The fact that the jury relied on the testimony of the defense's experts in reaching their decision is not sufficient to warrant a new trial. Based on the record, it was not unreasonable or arbitrary for the jury to find in favor of St. Anthony's. Therefore, the court did not abuse its discretion in denying the plaintiff's motion for new trial.

¶ 42 Lastly, the plaintiff argues that the trial court abused its discretion in not answering the jury's question whether a missed opportunity to inform the doctor would constitute a contributing cause under proximate cause. She asserts that the court's failure to provide any additional guidance on the definition of proximate cause led to jury confusion and therefore a new trial is warranted.

¶ 43 As a preliminary matter, we address the defendant's assertion that the plaintiff waived the issue by assenting to the trial court's determination that the jury's question was one of fact and agreeing to refer them to the instruction on proximate cause. Generally, when a party consents to the court's answer to a jury question, that party cannot then later argue on appeal that the answer was an abuse of discretion. *People v. Averett*, 237 Ill. 2d 1, 24 (2010). The record shows that after receiving the jury's question, the plaintiff immediately responded that the answer to the question should be "yes." When the court

and the defendant agreed that would not be an appropriate answer, the plaintiff then suggested the court respond, "proximate cause is any cause." Although the court ultimately rejected the plaintiff's suggestions in deciding to not give a definition outside of the instruction, the plaintiff opposed the court's decision and therefore preserved the issue for review.

¶ 44 The trial court has "a duty to provide instruction to the jury where it has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion." *People v. Childs*, 159 Ill. 2d 217, 228-29 (1994). "The failure to answer or the giving of a response which provides no answer to the particular question of law posed has been held to be prejudicial error." *Id*. at 229. However, the court may in its discretion "decline to answer a jury's inquiries where the instructions are readily understandable and sufficiently explain the relevant law, where further instructions would serve no useful purpose or would potentially mislead the jury, when the jury's inquiry involves a question of fact, or if the giving of an answer would cause the court to express an opinion which would likely direct a verdict one way or another." *Id*. at 228. A decision by the court on how to the answer a jury's question during deliberations is "ordinarily left to the discretion of the trial court, so that the trial court's decision will be disturbed on appeal only if that decision constituted an abuse of discretion." (Internal quotation marks omitted.) *People v. Nash*, 2012 IL App (1st) 093233, ¶ 39.

¶ 45 Here, we agree with the trial court that the jury's question was a question of fact, and therefore an answer from the court would have supplanted the jury's finding of fact with its own. Whether the actions of one of the parties satisfies the legal element of

proximate cause is a question that should be determined by the fact finder. The court was correct in its characterization of the question because the question asked whether a specific fact presented at trial would satisfy the element of proximate cause. Therefore, the court did not err in refusing to further elaborate on the issue and instead relied on the legal definition of proximate cause provided in the jury instructions.

¶ 46                                III. CONCLUSION

¶ 47    For the foregoing reasons, the orders of the circuit court denying the plaintiff's motion for judgment *n.o.v.* and for new trial are hereby affirmed.


¶ 48    Affirmed.